IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

ARTURO BURGUENO, )
Plaintiff, )
) CIVIL ACTION NO.
vs. )
) SA-09-CA-00905-OLG
ALTERRA MOUNTAIN COMPANY )
U.S. INC.,; INTRAWEST/ )
WINTER PARK OPERATIONS )
CORPORATION; AND EMILY )
FRAME, )
)
Defendants. )
______________________)

**************************************

ORAL AND VIDEOTAPED DEPOSITION OF
ARTURO BURGUENO
JUNE 16, 2025

**************************************

THE ORAL AND VIDEOTAPED DEPOSITION of ARTURO BURGUENO, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above styled and numbered cause on Monday, the 16th day of June, 2025 from 8:56 a.m. to 3:57 p.m., before PAMELA SUE PETERSON, Certified Shorthand Reporter in and for the State of Texas, reported by stenographic and computer-aided transcription, at the offices of Hoffman Reporting & Video Services,



206 East Locust Street, San Antonio, Texas 78212, pursuant to the Colorado Rules of Civil Procedure and the provisions stated on the record or attached hereto.



APPEARANCES OF COUNSEL:

For Plaintiff ARTURO BURGUENO:

BLOCH ONGERT, LLC
BY: TRENTON J. ONGERT, ESQUIRE
JOSEPH D. BLOCH, ESQUIRE
(Via Zoom Videoconference)
1725 Gaylord Street
Denver, Colorado 80206
(303) 331-1700
tongert@blochchapleau.com
jbloch@blochchapleau.com

For Defendant ALTERRA MOUNTAIN COMPANY U.S. INC.,; INTRAWEST/WINTER PARK OPERATIONS CORPORATION; AND EMILY FRAME:

CHILDS MCCUNE, LLC
BY: JORDAN LIPP, ESQUIRE
821 17th Street
Suite 500
Denver, Colorado 80202
(303) 296-7300
jlipp@childsmccune.com

Also Present:

ARTURO BURGUENO
Witness

CARL DOWDY
In-House Counsel
Winter Park Resort

STEVE LOPEZ
Zoom Facilitator
Videographer

PAMELA SUE PETERSON
Certified Shorthand Reporter



I N D E X


| | PAGE |
|---|---|
| Appearances | 3 |
| Index | 4 |
| ARTURO BURGUENO | |
| Examination by Mr. Lipp | 7 |
| Witness Signature Page | 215 |
| Reporter's Certificate | 216 |


E X H I B I T S


| Defendants' | | PAGE |
|---|---|---|
| Exhibit 1 | Winter Park Resort Ski Run Map | 35 |
| Exhibit 2 | Collection of Color Photographs | 50 |
| Exhibit 3 | Collection of Color Photographs | 119 |
| Exhibit 4 | Plaintiff's Responses to Defendant Winter Park's First Set of Written Discovery to Plaintiff | 133 |
| Exhibit 5 | E-mail String Subject: Burgueno v. Alterra, Case No. 24cv30098/Letter from Jordan L. Lipp Dated 05-05-25 | 135 |
| Exhibit 6 | Plaintiff's F.R.C.P. 26(a)(1) Initial Disclosures | 153 |
| Exhibit 7 | Tax History Report 2020 | 154 |
| Exhibit 8 | Burgueno 2021 Tax Return | 156 |
| Exhibit 9 | Burgueno 2022 Tax Return | 157 |
| Exhibit 10 | Burgueno 2023 Tax Return | 157 |
| Exhibit 11 | Burgueno 2024 Tax Return | 158 |
| Exhibit 12 | Baptist Health System PT Progress Note | 162 |

EXHIBITS (Continued)

| Defendants' | | PAGE |
|---|---|---|
| Exhibit 13 | Complaint and Jury Demand | 183 |
| Exhibit 14 | Complaint and Jury Demand | 185 |
| Exhibit 15 | Sky-Hi News Article Entitled "Man says medical bills totaled more than $1 million following 2023 chairlift fall at Winter Park Resort" | 191 |
| Exhibit 16 | Release of Liability, Waiver of Claims, Warning, Assumption of Risk and Indemnity Agreement | 192 |

QUESTIONS NOT ANSWERED

| Page | Line |
|---|---|
| 184 | 12 |
| 184 | 21 |
| 185 | 17 |
| 185 | 24 |
| 204 | 12 |



SAN ANTONIO, TEXAS, MONDAY, JUNE 16, 2025
8:56 A.M.

THE VIDEOGRAPHER: Good morning. We're going on the record. The time is 8:56. Today is June 16th, 2025. This is the oral video deposition talking place in person and by Zoom of Arturo Burgueno filed in the United States District Court for the District of Colorado, Civil Action Number: 1:25CV00005SKCSTV. Style of the case is Arturo Burgueno versus Alterra Mountain Company U.S., Inc.; Intrawest/Winter Park Operations Corporation and Emily Frame.

This deposition is taking place at 206 East Locust Street, San Antonio, Texas 78212. The court reporter is Pamela Peterson representing Hoffman Reporting and video in San Antonio. My name is Steve Lopez. I am the videographer, also representing Hoffman. Would everyone please state their appearance.

MR. ONGERT: This is Trenton Ongert for the plaintiff.

MR. LIPP: Good morning. This is Jordan Lipp on behalf of the defendants. With me is Carl Dowdy.



THE REPORTER: All right. If you'd please raise your right hand.

THE VIDEOGRAPHER: And we have one person appearing by Zoom.

THE REPORTER: Oh, yes. Mr. Black?

MR. ONGERT: Joe Black is appearing by Zoom, not -- not taking the -- or defending the deposition.

THE VIDEOGRAPHER: Thank you.

THE REPORTER: Okay. Sorry.

THE WITNESS: Yes.

THE REPORTER: Please raise your right hand.

THE WITNESS: Of course.

ARTURO BURGUENO,
having been first duly sworn, testified as follows:

THE REPORTER: Thank you very much.

EXAMINATION

BY MR. LIPP:
Q. Good morning Mr. Burgueno.
A. Good morning.
Q. We met just a minute ago, but --



A. Yes.
Q. -- once again, my name is Jordan Lipp and I represent the defendants. Have you ever been deposed before?
A. Never.
Q. Okay. So I'm sure you went through some of the ground rules with your attorney, but let me go through some of the ground rules just so it's all clear.

First thing is, I need verbal answers. "Yes," "no," things of that nature. "Uh-huh," "huh-uh" doesn't get recorded properly. Does that make sense?
A. It does.
Q. Perfect. Next, I will do my best not to talk over you, and if you can do your best not to talk over me; fair?
A. Yes.
Q. Great. Next, this is not an endurance contest. So if at any time you --
A. What does that mean?
Q. It's not an endurance contest. I'm --
A. Okay.
Q. -- not trying to tire you out.
A. Okay.

Page 61

Q. Have you had to make any modifications to that Kia in order to drive it?
A. I did not do any modification to drive that car.
Q. Okay. Do you drive your wife's car or any other cars?
A. Yes.
Q. Okay. And what -- what cars are those?
A. The other car is a BMW sedan.
Q. And have you had to make any modifications to the BMW sedan to drive that?
A. No.
Q. I see today that you're using a manual wheelchair.
A. Yes.
Q. Okay. I assume predominantly when you're using a chair, you're using a manual as opposed to an electric or power?
A. Yes.
Q. And at the time of the accident, you were six-foot, one-inch tall?
A. Yes.
Q. At the time of you -- the accident, you weighed about 188 pounds?
A. Yes.

Page 62

Q. So if your typical ski trip was a week in length, how many times would you estimate that you had skied with that Nissin before the accident?
A. I don't remember the number of trips that I used the Nissin, because I actually don't remember if I bought it in 2012 or 2013.
But after I purchased it, every trip we made to ski, I used the Nissin, that it was, a guesstimate, probably going between five and seven trips, I would say.
Q. Okay.
A. Yes.
Q. And you were skiing five days per trip?
A. Uh-huh.
Q. Yes?
A. Yes. Yes.
Q. And now, the -- before the day of the accident, how many times had you -- would you estimate that you had ridden the Explorer lift chair?
A. On that trip, I started -- zero. The date of the accident was the first day of that ski trip.
Q. Okay. So let me actually back up then.
A. Uh-huh.
Q. Prior to the trip in 2023 --
A. Oh, okay.

Page 63

Q. -- how many times do you think you had ridden the Nissin?
A. How many --
Q. I'm sorry. It -- strike that. Let me try this over here.
A. Yeah.
Q. Prior to the 2023 trip, how many times would you say that you had ridden that Explorer Express lift?
A. I don't know. Many times. Yeah, because each day several times. Yeah. And I don't know the amount of times. Plenty, I would say. Yes, many times.
Q. Okay. So you said that the accident was on your first day of the trip?
A. Other what?
Q. You said that this accident occurred on the first day of your trip?
A. Yes.
Q. Okay. And the accident was March 17th?
A. Yes, 2023.
Q. Okay. So let's -- walk me through the trip up to that point. So let's start with this. Did you fly San Antonio to Denver?
A. That occasion we drove.

Page 64

Q. Okay. You drove from San Antonio to Winter Park directly?
A. Yes.
Q. How long a drive is that?
A. 14, 15 hours, I think.
Q. Did you do it in one day?
A. Yes.
Q. Did do you that on March 16th?
A. Yes.
Q. Yes?
A. Uh-huh.
Q. Okay. So the day before the accident, March 16th, you drove from San Antonio to Winter Park?
A. Yes.
Q. Okay. Who else --
A. But when I say --
Q. Yes, please.
A. -- I drove there, we shared the wheel.
Q. Oh, yeah, yeah. No, I was going to ask that, but I appreciate the clarification.
A. Yeah.
Q. So who was with you on that trip?
A. My wife, my daughter and my son.
Q. Anyone else?

A. No.
Q. Okay. And so then to get to -- get to the question that you were just asking, who drove?
A. Myself, my son, and my daughter.
Q. Did you take the BMW or the Kia or some other vehicle?
A. No. We had a -- an SUV.
Q. What type?
A. It's a Honda Pilot.
Q. Is that also one of your vehicles?
A. Yes.
Q. Okay. Were there any modifications made to drive that?
A. No.
Q. Oh, what are your daughter's skiing abilities?
A. She can go -- she -- she is very comfortable with black terrain. So I would have to say that intermediate or intermediate, slash, advanced.
Q. Okay. And what are your son's snowboarding abilities?
A. The same. He is very comfortable in black terrain. Yeah. And I would say between intermediate and expert.



Q. And what about your wife?
A. I'm sorry?
Q. And what about your wife?
A. Ah, she is intermediate.
Q. Where were you staying at Winter Park for that trip?
A. Zephyr Mountain Lodge. Yeah.
Q. So for the 14- to 15-hour drive, sort of, what time did you leave San Antonio? What time did you get to Winter Park?
A. We left San Antonio by, I would say 5:00 p.m. and we arrived to Winter Park by 8:00 a.m.
Q. So did you arrive at 8:00 a.m. on March 17th --
A. Yes.
Q. -- the day of the accident?
A. Uh-huh. Yes.
Q. And did you check into the hotel first?
A. No. We went to have breakfast. We went into the -- yeah.
Q. You went where? Sorry.
A. Went for breakfast.
Q. Okay. Do you remember where?
A. It's -- I don't remember the name, but it's in the city -- or the town of Winter Park. I don't



remember the name.
Q. Okay.
A. But it's a coffee/breakfast place. I don't remember the name.
Q. And then did you check into the hotel after that? Or was the plan to check into the hotel after skiing that day?
A. No. We checked in at the hotel after breakfast.
Q. And so if -- did you say that you were taking turns driving with your wife and your children?
A. No, with my son and my daughter.
Q. Okay. And so then you were -- how much would you have slept then the night before in the car?
A. Probably six hours. Yeah.
Q. Of sleeping in the car?
A. (Nods head in an up-and-down motion.)
Q. And why had you chosen Winter Park for this trip?
A. We are very much familiar with Winter Park. We like the fact of it being a ski resort that accommodates people with disabilities. They have the NSCD. And it's familiar territory for us.



Q. Did you book the Zephyr through Winter Park's website?
A. Yes.
Q. Okay. And, you know, I mean, I forgot to ask this earlier, but I assume that you've been on Winter Park's website many times if you've planned multiple trips with -- to Winter Park?
A. I -- I visit the -- the website several times. Yes.
Q. Okay. And have you -- and you've seen the trail map before in paper and on -- and online?
A. Yes.
Q. Okay. Winter Park has an app. Have you been -- have you downloaded that app?
A. I don't remember.
Q. But you would have looked online at least at -- at the website?
A. In my computer, I -- I -- yes, I've -- I've gone in my computer several times to Winter Park's website.
Q. Okay.
A. Uh-huh.
Q. So now, I -- I know earlier today you said that you would normally start a trip with lessons.
A. Yes.

Page 101

Explorer?
A. I don't remember.
Q. Okay. So when you -- actually, let me back up. Before you -- before you started sit skiing, did you lower the restraint bar?
A. Yes.
Q. Did you always lower the restraint bar?
A. Yes.
Q. Why did you lower the restraint bar?
A. Because of the safety that it provides.
Q. So before you -- before you were sit skiing, you knew that lowering the restraint bar would provide you more safety when you were Alpine skiing?
A. Yes.
Q. And you understood that there was a tether that many sit skis have that you can tether to the chairlift to provide more safety; correct?
A. I do know that.
Q. Okay. And so why were you not using a tether to provide that type of safety to the sit ski?
A. That's not something that intermediate sit skiers or independent sit skiers do because we know that as long as we are pulling your way back, as long as -- sometimes you're pulling back with your free

Page 102

arm and back you are safe, and you're not supposed to be, like, rocking or doing stupid things that could bring you out of balance.
Q. But you could have had a tether?
A. I could.
Q. But you chose not to?
A. It's not a practice. Yeah, so I chose not to, as I had done many years before, like the last -- for the last seven years of skiing or more. Yeah.
Q. So when you skied into the infield, the lift operator, then, stopped the lift?
A. Yes.
Q. Did you say anything to the lift operator?
A. No.
Q. By the way, describe the lift operator for me.
A. Describe the lift operator?
Q. Yes.
A. I know it's a female. That's it.
Q. Was she young or old?
MR. ONGERT: Object to foundation.
THE WITNESS: I don't know.
Q. BY MR. LIPP: Is there anything other than telling me the -- the lift operator was female that you can tell me about her?

Page 103

MR. ONGERT: Object to foundation and form.
THE WITNESS: No. I think -- I remember she's a female because of hair -- of her hair but nothing else. I don't remember any particular attributes to her face or anything like that.
Q. So that first attempt, I think you testified already, you don't remember whether you had asked for it to be slow or not.
Do -- I -- and then I take it, there were no other conversations that you had with her during that first attempt?
A. I don't remember any other conversation --
Q. Okay.
A. -- or any conversations.
Q. You didn't ask for a pull back?
A. Hum.
Q. Well, let me back up. Would -- how often would you ask operators, if ever, for a pull back?
A. As I became more independent, it was less frequent. So, yeah, when I was, like, more independent, I would not ask for a pull back. Sometimes I would ask for a slow chair.
Q. Okay. So sometimes you would ask for a slow, sometimes you wouldn't. But -- but by 2023, you really weren't asking for pull backs anymore?

Page 104

A. Correct.
Q. So once you skied into the infield, how did you get from the infield back onto the load board?
A. I was standing on my sit ski, and with my outriggers, I pushed myself into the -- the corner, the incline. Someone pushed me up. I think it was my son who pushed me up the incline so I was back there out of the infield. Yeah.
Q. So where was the chair at this point?
A. The chair was ahead of us. Wow, let me -- let me see. Let me think. I don't know. Honestly, I don't know. I don't know.
Q. So your son, how did he get out to help you? Did he ski off as well with you? Did he jump out? How -- how was he there?
MR. ONGERT: Object to form and foundation.
THE WITNESS: What I can say, first, I was not looking at him. But as an assumption, I would say that he's -- I had mentioned he's a snowboarder, so he just jumped from the chairlift into the infield. So he was there at the infield.
Q. Okay.
MR. ONGERT: Let's take a break, Jordan. I need to use the restroom.
MR. LIPP: Sure.

Page 109

Q. Yes.
A. No.
Q. So, you --
A. No.
Q. Did they help you at all to get back onto the loading platform?
A. No.
Q. Okay. So you got there all by pushing yourself with your outriggers?
MR. ONGERT: Object to form and foundation.
THE WITNESS: (Nods head in an up-and-down motion.)
Q. BY MR. LIPP: Is that yes?
A. Yes, it's a yes.
Q. Okay.
A. I -- I used my outriggers to move around there.
Q. Okay. And now, what about your daughter, was she down there? Or was she still on the chair?
A. She -- she stayed on the chair.
Q. Okay. And how high up was she at this point?
MR. ONGERT: Object to foundation.
THE WITNESS: I don't know.
Q. BY MR. LIPP: I mean, when you looked at

Page 110

her, was she beyond the point where you could just hop off?
MR. ONGERT: Object to form.
THE WITNESS: I don't know.
Q. BY MR. LIPP: Okay.
A. I don't know.
Q. Okay. But your son obviously had hopped off or rode off at some point, so he was there?
MR. ONGERT: Object to form.
THE WITNESS: I know he was at the infield and he was there next to me. Yes, I know that.
Q. BY MR. LIPP: Okay. So then what -- what, if anything, did the lift operator tell you next?
A. She instructed me to load on that specific chair and I followed her instructions.
Q. When you say she told you to load on the chair, this is the chair that was stopped?
A. Yes.
Q. And so you loaded onto a chair while it was stopped?
A. Correct. Yes.
Q. When you loaded onto the chair, I assume all four seats were empty?
A. Yes.
Q. Which seat did you choose?

Page 111

A. The one on the left --
Q. Okay.
A. -- again.
Q. So the one that's furthest to the left as you're looking up the mountain?
A. Yes.
Q. Okay. And why did you choose that one that was furthest to the left to load on while the chair was stopped?
A. It's the furthest from the bull wheel, it's the furthest out. Yes.
Q. Okay. Yeah. And is there a reason it's -- are you normally in that chair? Do you normally like to load in the furthest left chair or position?
A. It's -- it's a lift that goes as Explorer. So looking up the mountain on the left -- right side is coming down and the left side is going up, I prefer the left because I am further from the posts. I'm on the outside of the post of the --
Q. Okay.
A. -- chairlift line.
Q. And when you loaded, when the chair was at a stop, was your monoski in the load position? Was the Nissin in the load position?
A. Yes. I got back. Yes. So I always load

Page 112

chairs in load position.
Q. Now, as you were loading onto the stopped chair, where was your son?
MR. ONGERT: Object to foundation.
THE WITNESS: I don't know.
Q. BY MR. LIPP: I mean, was he by where you were, helping you load on the chair at all?
A. I don't think he was helping me there. No, he was not helping me there.
Q. Was the lift operator helping you onto the chair? Or did you get up onto the chair on your own?
MR. ONGERT: Object to form and foundation.
THE WITNESS: I know that if I went up that chair, I lifted with my outriggers and then pulled back to go on the chair. I don't remember if the lift operator helped me.
Q. BY MR. LIPP: So you don't remember one way or the other whether she helped you get on the chair?
A. I don't remember if she did or did not.
Q. Okay. It sounds like you weren't, at that point, asking for a pull back. So you wouldn't have asked her for a pull back?
MR. ONGERT: Object to form.
THE WITNESS: I don't remember. I don't know that.

Q. BY MR. LIPP: Okay. Fair enough. Let me -- let me back up and break that apart. You testified earlier that in January you were not asking for pull backs anymore by 2023.
A. Correct. In -- yes.
Q. Okay.
A. Yeah.
Q. And so sitting here today, you don't have a -- a specific memory one way or the other of whether you asked the lift operator for a pull back?
A. Correct.
Q. Okay. It -- but it would probably be unlikely that you would have because you weren't generally asking lift operators for pull backs in 2023?
MR. ONGERT: Object to form and foundation.
THE WITNESS: That could be an assumption. I don't -- I don't know.
Q. BY MR. LIPP: Okay. You just don't know whether you asked for a pull back or not?
A. Correct.
Q. So walk me through everything that you remember the lift operator saying from when the lift stopped and you had skied into the infield until the lift started up again?



A. I remember she said -- she instructed me to load on that chair. And I think that's it. I don't remember anything else that she told me.
Q. Okay. Did you say anything to her?
A. I don't think so.
Q. At some point she, then, started up the chair?
A. (Nods head in an up-and-down motion.)
Q. From when she started up the chair until you were above the infield, did you say anything to her?
A. I don't remember.
Q. You don't remember saying anything to her?
A. No.
Q. Did she say anything to you from when she started up the chair until you were above the infield?
A. I don't remember either.
Q. Okay. So you don't have any recollection of any communication between either of you from when the chair started until you were moving above the infield?
A. No. No.
Q. And I'm sorry, there was a negative in there in the question, and I just need to make sure



that we get it right. So I apologize for asking what's more or less the same question again.
But from when the chair started up until you -- until the chair was in the air and you were on your way, as far as you recall, there were no conversations between and the lift operator; correct?
MR. ONGERT: Object to form, and asked and answered.
Q. BY MR. LIPP: I'm correct that there were no conversations?
A. I don't remember. I don't remember any conversation with the lift operator at that time when the chair lift advance towards into the infield.
Q. Okay. Where -- where was your son when he boarded the lift?
MR. ONGERT: Object to foundation.
THE WITNESS: I don't know where he was standing.
Q. BY MR. LIPP: Did you have any discussions with him or anyone else from when you started to get onto the chairlift when it was in the stop position until it had moved forward and started riding up above the infield?
A. I don't remember any conversation with anyone --



Q. Okay.
A. -- at that time.
Q. So where was your son sitting compared to you on that chair after it started back up?
A. My son was sitting next to me.
Q. Okay. And then were there other people on the lift too?
MR. ONGERT: Object --
THE WITNESS: Yes.
MR. ONGERT: Go ahead.
Q. BY MR. LIPP: How many?
A. Two.
Q. Were they on skis or snowboards?
MR. ONGERT: Object to foundation.
THE WITNESS: I do not remember.
Q. BY MR. LIPP: Okay. Men or women?
MR. ONGERT: Object to foundation.
THE WITNESS: I think one was a woman, and I think she was traveling with a kid.
Q. BY MR. LIPP: And so it was one adult and one child on the lift?
A. That's what I think.
Q. Okay. And did you at any time -- well, you didn't have any conversations with anyone, so then you never asked them to wait for another lift ride?

A. No.
Q. And did you ever ask the lift operator to stop the lift again?
MR. ONGERT: Object to form.
THE WITNESS: No.
Q. BY MR. LIPP: Okay. And you never told anyone, can I please just ride this lift, just my son and me?
A. I did not do that.
Q. And if you didn't have any conversations with anyone, then you never told the lift operator that you felt that you were on the chair incorrectly?
MR. ONGERT: Object to form; foundation.
THE WITNESS: I said to no one that I was seated incorrectly because I was seated correctly when I loaded --
Q. BY MR. LIPP: Okay.
A. -- into the chair.
Q. Did you feel that you were seated correctly in the chair?
MR. ONGERT: Object to form and foundation.
THE WITNESS: Yes, I feel that I was safely placed on the chairlift.
Q. BY MR. LIPP: Okay. And as the chairlift started to lift off the snow and going over the



infield, did you feel that you were placed safe in the correct position on the chairlift?
MR. ONGERT: Object to form and foundation. Give me a minute to object. Thanks.
Q. BY MR. LIPP: Did you need me to repeat the question?
A. Yes, please.
Q. Sure. As the chairlift was -- there's a point after you load that the chairlift starts to lift off the snow; correct?
A. Yes.
Q. And as it starts to lift off the snow, you start to rise up above that infield area; correct?
A. Yes.
Q. Okay. As the chair started to rise up above the snow and started to rise up above the infield, did you feel that you were seated properly?
MR. ONGERT: Object to form and foundation.
THE WITNESS: Let me answer, stepping back. So when I loaded the chair, I was safely placed at the chair. The chair that I loaded was way behind the load zone area. It was in a perpendicular line to the load zone area.
As the lift operator instructed me to load that chair, I followed her instructions. I loaded



there. I was safely and securely on the chair. That, I know.
Q. BY MR. LIPP: And then the chair turned around the bull wheel?
A. Yes.
Q. So now the chair is facing forward and uphill?
A. I don't know.
Q. Give me just a minute, Mr. Burgueno. I want to pull out some photos to see if it helps.
(Defendants' Exhibit 3 was marked.)
Q. BY MR. LIPP: Placed in front of you is Exhibit 3.
A. Let me take out my glasses --
Q. Oh, absolutely. Take your time.
A. Yeah.
THE VIDEOGRAPHER: Need help?
THE WITNESS: Maybe they're in my jacket in the car.
MR. ONGERT: Oh, do you want to run out?
MR. LIPP: Do you want to go off the record real quick?
MR. ONGERT: Yeah, let's go off the record.
THE VIDEOGRAPHER: Off the record at 1:13.
(A brief recess was taken.)



THE VIDEOGRAPHER: Going back on the record at 1:18.
Q. BY MR. LIPP: You have your eyeglasses now, Mr. Burgueno?
A. I do, yes. Thank you.
Q. And I want to make sure that you can see. So placed in front of you is Exhibit 3, which is Bates-labeled WP 17 to WP 30. And I thought it would be helpful for the conversation we're having if we look at what's Bates-numbered Page 28. Do you mind turning to that page?
A. (Witness complies.)
Q. Are you there, sir?
A. I am there. Yes.
Q. Perfect. Okay. So if you're looking at Page 28, you can see that when this photo was taken, there is a chair with the number 55 that's halfway around the bull wheel, more or less, and then there's a chair 54 that a ski patroller has just sat down on.
A. Yes.
Q. Do you see that?
A. Uh-huh.
Q. Okay. So when you say that you loaded onto the chair when it was stopped, where would that be compared to where chair 55 is in this photo, Bates

Page 28?
MR. ONGERT: And I'll object to form.
THE WITNESS: I think it was where chair 55 is located.
Q. BY MR. LIPP: So approximately the location of chair 55?
A. Yes.
Q. Okay. So I was trying to get across, and maybe my words weren't that -- that good earlier, but the chair would have, then, rotated and moved forward to where chair 54 is sitting in this picture that we're looking at; fair?
A. Fair.
Q. Okay. So when you got to where chair 54 is in this photograph, did you still feel that you were secured?
MR. ONGERT: Object to form and foundation.
THE WITNESS: I didn't feel anything to make me feel that I wasn't secure.
Q. BY MR. LIPP: Okay. And so as far as you could tell, when you were in this position of chair 54, close to where the lift operator consoles were, as far as you can -- could tell, everything was fine?
MR. ONGERT: Object to form and foundation.
THE WITNESS: I don't -- I did not feel



anything that would make me feel that I was not secure.
Q. BY MR. LIPP: Okay. And the lift operator -- well, first of all, you see the little console box with the controls for the lift?
A. Yes.
Q. Yes? And so the lift operator would have been in the vicinity of those controls when you passed by; correct?
A. I don't know.
MR. ONGERT: Object to foundation. Sorry.
Q. BY MR. LIPP: Okay. Do you recall where the lift operator was at when your chair moved forward to the vicinity of chair 54 in this photo?
A. I do not. I remember she instructed me to load on that chair that was stopped.
Q. Okay. But after that time you don't remember where she was?
A. No.
Q. Okay. And it sounds like you didn't have any conversations with her after that time?
A. I don't remember any conversation.
Q. Okay. And you don't remember your son or anyone else having any conversations with her at that point?



A. No, I don't remember any. No. Yeah.
Q. And so where in this photo that we see the picture of the ski patroller sitting down, there was -- you were seated, sort of, just to the left of where the controller was, and then your son was sitting immediately to your right?
A. Yes.
Q. Okay. Then if we continue, and I'm just using this photo as an example, on Bates page Winter Park 28. But you can see that there would be -- and I can't see it says chair 53, but what would be chair 53, the chair that's going up above the infield. Do you see that?
A. You mean the one after -- after the one with the ski patrol?
Q. Yeah. It has three people on it, two skiers and a snowboarder in this photo?
A. I can see that.
Q. Okay.
A. The chair.
Q. So when you were there, you know, coming out above the infield, did anything feel or seem wrong or amiss at that point?
MR. ONGERT: Object to form and foundation.
THE WITNESS: I think that happened as I



was surprised that all the seats were occupied. I was surprised that I was sitting with other two people. Yeah. But everything happened so fast. Of course, here, breaking it down into little squares or little pieces, it seems like it was, like, more than five minutes.
But it happened so fast that the thing that I felt is that I felt surprised that we are -- that there were these other two people with me and my son sitting next to me.
Q. BY MR. LIPP: Did you say that to anyone? Or was that just what you were thinking internally?
A. I don't remember verbalizing that to anyone.
Q. Now, I know that you lost consciousness in the fall.
A. I did.
Q. Do -- how is your memory from, once you were, sort of, in the position that we're looking at in the photo here of chair 53 until your fall, do you remember what occurred? Do you not remember what occurred? Do you remember pieces of it?
A. The only thing that I remember is that we went through the first tower and that's -- and after that, I don't remember anything.

Q. Okay. Do you remember falling off the lift?
A. No.
Q. Okay. Sir, obviously, I understand that this may be difficult to talk through all this. Please understand that it's just my job to ask all these questions. And so I never mean it -- to be difficult. If you want to take a break at any time, that's fine.
A. Of course.
Q. So do you remember changing your monoski from the load position to the ride position?
A. No. No.
Q. Do you know whether you had done that or not?
A. No. And I don't remember.
Q. Okay. And you -- you had outriggers with you; right?
A. (Nods head in an up-and-down motion.)
Q. And so were you holding your outriggers as you were riding up?
A. So the outrigger on the hand that is on the outer side, sometimes I'm holding the -- if you see on these pictures, on the left side, there's like a bar where you can place your hand or it prevents you



from falling to one side. So normally I could put my hand there and have the outrigger pointed down. So it would be my hand over that little bar, normally. But other than that, I don't remember.
Q. Okay. Do you remember on the ride where the accident happened if your left hand was there? Or do you know where your left hand was?
A. I do not. No.
Q. What about your right hand, do you remember where your right hand was as you were riding up?
A. I do not remember.
Q. It sounds like oftentimes you put your left hand on the -- on the little side bar to the left. What do you normally do with your right hand on the outrigger?
A. The other hand, I put it behind the free seat next to me to be pulling me back.
Q. Where is your outrigger during that time?
A. It hangs here. (Indicating)
Q. Is it hanging behind --
A. Yeah.
Q. -- the chair?
A. Yeah.
Q. Okay. So you have the outriggers on the outside. The out -- the out -- when you're sitting



there, you're not sitting with the outrigger, sort of, on the internal part of chair, but you're sitting with the outriggers on the outside of the chair?
MR. ONGERT: Object to form.
Q. BY MR. LIPP: Is that making sense?
A. Neither of those could be the only way I ride. You could --
Q. You ride multiple ways?
A. -- they could be inside or they could be outside.
Q. Okay.
A. Normally, I -- I use this hand (indicating) to pull myself back to feel at ease and then I might bring my hand down inside.
Q. Your right hand?
A. Close -- my right hand down --
Q. Okay.
A. -- close to me.
Q. Okay.
A. Uh-huh.
Q. But it sounds like when you were riding up the chairlift for the accident time, you don't remember whether you had your right hand backwards or on the inside?
MR. ONGERT: Object to form.



THE WITNESS: I remember it not outside. I had no space because this space (indicating) was occupied by my son, so I didn't have the space to lift my hand out and not hit with the outrigger the next -- the person next to me. So I know it was not back.
So it was probably -- well, it was not back at the time of the accident. That, I know.
Q. BY MR. LIPP: Okay. Do -- do you know where your right hand was?
A. No.
Q. Okay. And it sounds like you don't remember where your left hand was either?
A. No.
Q. Okay. And I -- I'm trying to visualize with the Nissin, N-I-S-S-I-N, monoski, it's -- is it your right hand or your left hand that you use if -- when you're changing it from load position to right position?
A. The mechanism, the lever is on the right side of the sit ski.
Q. On the right side. Okay.
A. Uh-huh.
Q. Did you at any point tell your son who was sitting next to you that you felt insecure?

and then the cruise to the Caribbean?
A. Yeah.
Q. Okay. And I assume that you flew for those trips to Monterrey or you drive?
A. Two of them I flew, two of them I drove.
Q. Okay. If we could turn back to Exhibit 6. These are your initial disclosures. And if you can turn to Page 13.
A. (Witness complies.) Yes.
Q. Actually, let's start with bottom of Page 12. It says, "Medical expenses." You see that?
A. I see that.
Q. Okay. And then it adds up medical expenses and totals it at -- at $784,781.26. Do you see that?
A. I see it.
Q. Okay. And this is accurate, to the best of your knowledge?
MR. ONGERT: Object to foundation.
THE WITNESS: Hmm, from the health insurance company I have payment request of more than that amount. And I don't remember the exact amount, but I think it's about $1,000,000.
Q. BY MR. LIPP: So -- I'm sorry. You're saying that the disclosure number here is inaccurate?
MR. ONGERT: Object to form.



THE WITNESS: I don't say that.
Q. BY MR. LIPP: So what's the information that you got from the health insurance company about a million dollars?
A. As a client of the insurance company, I can go to my portal online and there you can see each claim that they have received, and the total amount is above the total amount that is here on Page 13.
Q. Do you know what those -- that total amount is?
A. As I mentioned, it's about 1,000,000, but I don't remember the exact amount.
Q. Is it more than a million?
A. It's about 1,000,000, but I don't know the order or amount above 1,000,000.
Q. And who is your insurance company?
A. United Health.
Q. Okay. And how often did you pay out-of-pocket?
A. The out-of-pocket amount is -- the maximum out-of-pocket amount is 10,000.
Q. So let's just go to the first page of Exhibit 6.
A. Oh, yes.
Q. And the -- if you look at caption, it lists



three defendants: Alterra Mountain Company U.S., Inc., Intrawest, slash, Winter Park Operations Corporation and Emily Frame. Do you see that?
A. I can -- yes, I do.
Q. So you're suing Miss Frame personally?
MR. ONGERT: Object to form; foundation.
THE WITNESS: I can see it here, yes.
Q. BY MR. LIPP: Okay. Who is Miss Frame?
A. Either that's the name of the lift operator at Winter Park.
Q. Okay. Why are you suing Miss Frame personally?
MR. ONGERT: Object to form and foundation.
THE WITNESS: I don't know how to answer that question. If you ask me why I -- Alterra Mountain or Interwest/Winter Park, I also don't have the answer to that question.
Q. BY MR. LIPP: Well, let me ask you a different question. What exactly did Miss Frame do wrong, in your mind?
A. In my mind?
Q. Yeah. Or -- or just general, what did Ms. Frame do wrong?
A. She was the only lift operator that has asked me to load all the way back on the -- on the --



on lift. Yeah. Every time I have loaded a lift, it has been at the load zone area. I had never been asked or instructed to load all the way back. She's the only one that has done that.
Q. And what is your basis for thinking that there's something wrong about that?
A. Well, I'm not a -- an expert and it's not for me to say if that's correct or not.
But I do know that when I am on the chair lift, before it goes up, my ski touches the ground. And if is there is a movement that is not forward, but it's forward and, like, circular, there's friction caused on that ski. So that's -- that's what I think.
Q. But if there's friction caused on that ski -- you -- you testified earlier that once you were by the operator console everything still felt fine to you; correct?
A. It felt fine --
MR. ONGERT: Object to form and foundation. Go ahead.
THE WITNESS: If felt fine.
Q. BY MR. LIPP: Okay. And so you don't know that anything was wrong at that point?
A. And, exactly, that's why I said my

deposition. The time is 3:57. We're off the record.
(Whereupon, the proceedings were concluded at 3:57 p.m.)

-o0o-



ERRATA SHEET

CHANGES AND SIGNATURE

Oral Deposition of: ARTURO BURGUENO

Date: JUNE 16, 2025

PAGE LINE CHANGE REASON

_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________

Date



I, ARTURO BURGUENO, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

ARTURO BURGUENO

STATE OF TEXAS:

COUNTY OF BEXAR:

Before me, ______________________________, on this day personally appeared ARTURO BURGUENO, known to me, or proved to me under oath or through ID or other document, to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ___________ day of ____________________, A.D., 2025.

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

My Commission Expires:_____________________



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

ARTURO BURGUENO, )
Plaintiff, )
) CIVIL ACTION NO.
vs. )
) SA-09-CA-00905-OLG
ALTERRA MOUNTAIN COMPANY )
U.S. INC.,; INTRAWEST/ )
WINTER PARK OPERATIONS )
CORPORATION; AND EMILY )
FRAME, )
Defendants. )
_______________________)

***********************************************

REPORTER'S CERTIFICATE

ORAL AND VIDEOTAPED DEPOSITION OF

ARTURO BURGUENO

JUNE 16, 2025

***********************************************

I, PAMELA SUE PETERSON, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JUNE 16, 2025, was duly sworn by the officer and that the transcript of the deposition is a true record of the testimony given by the witness;

That the original deposition transcript was delivered to ______________________________,

That a copy of this certificate was served